## Leary, et al. v. Leary.

(Decided May 23, 1924.)

### Appeal from Grant Circuit Court.

1. Wills—Proper to Permit Propounder to have Will Read Even After Motion for Directed Verdict.—It is proper for court to permit propounders of will to have it read to court or jury when its execution has been proved even after motion for directed verdict.

2. Wills—Paper Held Properly Established by Attesting Witnesses.—A paper was properly established as a will by attesting witnesses who stated that they attested instrument in presence of testator and of each other, and upon his invitation or suggestion, and that person who had prepared it stated to them in presence of testator that it was his will.

3. Wills—Not Necessary that Attesting Witnesses Know its Contents.—It is not necessary that attesting witnesses to a will know its contents.

4. Wills—Not Necessary on Preliminary Hearing that Testator be Shown to have Been of Sound Mind.—It is not necessary on preliminary hearing that testator be shown to have been of sound mind, for there is always a presumption of sanity which continues until contesting parties overcome it.

5. Wills—Finding in Favor of Will Against Mental Incapacity and Undue Influence Sustained.—In will contest, finding of jury in favor of will as against claim of undue influence and mental incapacity held proper under evidence.

6. Trial—Duty to Call Attention to Court's Promise to Admonish Jury.—Where court in overruling motion to admonish jury as to consideration of evidence stated he would do so later, it was duty of movants to thereafter call his attention to it.

7. Evidence—Will Best Evidence of Contents.—In will contest, court properly denied witness right to state contents of former will where it was not shown that such former will was not then in existence, as it was the best evidence.

8. Evidence—Court Properly Denied Witness Right to State Part of Contents of Will.—In will contest, court properly denied witness right to state part of contents of former will, where witness stated that he only knew a part of its contents.

9. Wills—Determination of Issues for Jury though Testamentary Paper May be Unjust.—However unjust a testamentary paper may ap-

pear to be on its face, it is province of court only to submit on conflicting evidence determination of issues as to undue influence and mental incapacity to jury.

C. C. ADAMS for appellants.

DICKERSON & HOGAN for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

J. J. Leary, then in his 81st year, died on the 18th of January, 1921. On the 23rd of August theretofore, and after he had passed his 80th anniversary, he executed his will wherein he devised his estate of some ten or twelve thousand dollars chiefly to his eldest son, John H. Leary, and only made bequests of small sums to his other three living sons, and to two grandchildren of deceased children.

The paper was probated in the county court apparently without contest, but the heirs at law other than John H. Leary, prosecuted an appeal to the circuit court from the order of probate, wherein they contested the validity of the instrument upon the grounds of mental incapacity of the testator, and alleged undue influence brought to bear upon him in its execution by the chief devisee, John H. Leary.

On a trial in the circuit court the jury returned a verdict upholding the instrument as the will of J. J. Leary, upon which judgment was entered, and from the judgment this appeal is prosecuted by the heirs at law.

At the outset we are met with the earnest contention that contestants were entitled to a directed verdict to the effect the paper was not the will of J. J. Leary because, as claimed, the propounders on the preliminary hearing in the circuit court failed to make out a *prima facie* case. That contention is based upon two grounds; (a) the alleged failure of propounders on such hearing to establish by competent evidence the proper execution and publication of the paper, and (b) because no paper or writing purporting to have been signed by decedent was read to or exhibited to the court or jury.

The first witness offered by the propounders on the preliminary hearing was a deputy county court clerk, who produced and identified the paper as the will of J. J. Leary filed in the county court clerk's office, but when counsel offered to have the witness read the paper, upon objection by contestants, the court declined to permit it

to be read at that time, upon the ground apparently that as the trial in the circuit court was a *de novo* one and the due execution had not been shown, it was not then competent. Thereafter the two attesting witnesses were introduced, who proved the execution of the will by J. J. Leary and their attestation in his presence and at his direction, but thereafter the propounders did not upon the preliminary hearing offer to read the paper to the court or jury. However, after contestants had introduced and partially examined the first witness, the propounders were permitted then to recall the deputy clerk and read the paper to the court and jury.

Clearly after the introduction of the two attesting witnesses, and even after the motion for a directed verdict, it would have been proper for the court to permit the propounders to read or have the paper read. At any rate it is difficult to understand how this procedure could have in any material way affected the substantial rights of the contestants. The paper was in fact the paper offered for probate, and there is no claim or suggestion that any other paper had been substituted for it.

Nor can the claim that the paper was not properly established by the attesting witnesses be sustained. They each state that they attested the instrument in the presence of J. J. Leary and of each other, and upon his invitation or suggestion; and that while the paper was not read to them and they did not know its contents, Blackburn, who had prepared it, stated to them in the presence of J. J. Leary that it was his will, and they so understood at the time, as did all parties present.

It is not necessary that attesting witnesses to a will shall know its contents, for in many instances the testator may not desire even the attesting witnesses to know what disposition he has made of his property. Nor is it necessary that they shall understand they are attesting an instrument as a will, but only that there shall be a substantial compliance with the provisions of the statute. Flood v. Pragoff, 79 Ky. 607.

Nor is it necessary on such preliminary hearing that the testator be shown to have been of sound mind at the time of the execution, for there is always a presumption of sanity, and that presumption will continue until the complaining parties by the introduction of evidence overcome it.

We find no substantial ground upon which to sustain this reason for a reversal.

The evidence for the contestants tends to show that decedent was in his earlier life and maturer years a man of fine physique and strong mentality, but that about one year before the execution of the instrument in question he was struck and knocked down by a railroad train, whereby he was seriously injured, and which injuries affected certain organs of his body, shocked his nerves and impaired his health generally, both mentally and physically. It is shown that he recovered in a large measure from this injury in a few months, and was able to get around, and in a fashion transact certain business, but was never really as strong and vigorous physically as he had theretofore been.

It is likewise shown that in the spring of 1920 he suffered an attack of influenza and was for a time quite dangerously ill and under the care of physicians; but it likewise appears that he in due time, in some measure, recovered from this illness. But about July, 1920, he was again taken quite ill and was confined to his bed most of the time for a month or more before the execution of this instrument.

It appears that during all this period he was living at his old home place and that for a month or more up to the 18th of August, when he was removed to the home of his son, John H. Leary, in the neighborhood, he had lived at his home with only one attendant, and that a man, who waited on him, did the cooking, and apparently everything that was done about the place, except the washing. In this situation on the 18th of August he was removed to the home of his son, John H. Leary, nearby, and there he executed the will five days later.

There is evidence that about that time and during his illness he failed to recognize some of his children, and failed to recognize other persons he had known long and well. There is also evidence that during this illness he called for or asked about a deceased brother who had in fact at that time been dead for three years.

The evidence tends also to show that during his last illness his voice was very weak, he had fallen off greatly, his articulation was very indistinct, and his nerves very unsteady and shaky; that he showed a disposition to shed tears in the presence of others without any apparent cause. It was also shown that he had always manifested great affection for his children and grandchildren, and had spent much of his time with them.

In addition to all this a number of witnesses, none of whom were experts, expressed the opinion that he was not at or about that time capable of disposing of his property.

The evidence as to undue influence of John H. Leary is by no means satisfactory. It does appear that he lived near his father, and that at the time the will was executed his father was at his home, and several witnesses express the opinion that John had great influence with him. It appears, however, by other evidence that he and his son John frequently differed and sometimes quarreled, and contestants undertake to show that he in fact had no confidence in his son John.

But, two papers executed by him during the last few months of his life are chiefly relied upon as evidence of undue influence. The first of those papers was dated August 14, 1920, and is in the form of an agreement between decedent and John H. Leary. It shows on its face that decedent turned over to his said son John certain stock which he himself was at the time unable to look after, and which agreement gives specific directions as to the handling of said stock; it requires John H. Leary to take immediate charge of the stock, to give them proper care and attention, to repair and erect fences so as to keep them from bothering the neighbors, and as compensation therefor agrees to give him a certain interest in some of the stock, and the use of the grass on a certain pasture, and half of the corn fodder to feed them. It requires John H. Leary to build certain fences and do all repairs on them. It further gives John the right to cultivate certain land in corn and crops for the year 1921, and the use of a certain mule, but requires him to take care of the mule, and provides for a division of the corn, but requires John to shuck all of it and requires of him the taking care of all the crops.

When it is considered that decedent was at the time in bad health and unable to do these things for himself, this paper furnishes no convincing evidence of undue influence; but is in fact only such a contract as a parent would naturally make with his child living nearby to take care of his stock and crops, and agreeing to give him liberal compensation therefor.

Likewise on the 10th of January, 1921, just eight days before appellant's death, he executed a paper whereby he authorized H. M. Blackburn, who had been named in the will as his executor, to go to a certain bank and get

therefrom certain land notes which decedent held against John H. Leary, and directed him (Blackburn) to deliver same to John H. Leary, and in the same paper authorized Blackburn to go to the county clerk's office and have the record show the release of the liens securing said notes.

This last paper was executed by the decedent nearly five months after the execution of his will, and only eight days before his death, and plainly is no evidence of any undue influence exerted by John H. Leary in the execution of the will.

Opposed to all of this is evidence by the propounders showing that while in fact the last year or so of his life the decedent had not been as vigorous since the accident and since the spell of influenza, yet that neither of those things had affected his mental vigor; that at all times right up to his death his mind was clear and his will power strong.

In addition to evidence of this character by persons who had known him for many years, it is shown by two physicians, one of whom was waiting on him throughout the period covered by the execution of the will, and another of whom treated him some months thereafter, that they had never seen any sign of mental weakness, and he appeared to them to be wholly capable of knowing the objects of his bounty, his duty to them, his property, and how he desired to dispose of it. It appears from the evidence of one of these physicians that in October or November, after the execution of the will, decedent went some miles to the county seat and there called upon the physician and consulted with him; that he told him in an intelligent way about the treatment he had theretofore had, what his symptoms were and intelligently discussed his condition. That decedent then realized he could never get well, but showed no evidence of any mental weakness whatsoever.

Appellants complain that when they offered evidence tending to show the declarations of the decedent in setting forth the alleged undue influence and unfair practices of his son, John H. Leary, the court in its admonition to the jury directed them not to consider such evidence on the question of undue influence, but that they might consider it only on the question of mental capacity, and did not add that they might consider it on the question of his susceptibility to influences at the time the will was made. The record discloses that at the time the court overruled the motion to add this admonition he stated he would do

so later, but the record fails to disclose that it was ever done or that appellants ever asked thereafter to have it done. Even if it be conceded this was prejudicial error, it seems apparent that as the court had agreed to add this admonition, it was the duty of appellants to thereafter call attention to it.

.It is earnestly contended that the witness Wolf was erroneously denied the right to state the contents of a former will made by decedent. In the first place it is not shown that such former will is now in existence, for if it is it is the best evidence of its contents. If, as suggested by counsel, it is among the papers of decedent, and therefore under the control of his executor, the law furnishes a method by which he may be required to produce it. In the next place the witness explicitly says that he only knew a part of the contents, and even if the will was shown to have been destroyed this evidence would not make him competent to state only a part. The fact that there had been such former will was permitted to go to the jury in evidence.

There is no specific complaint of the instructions, and a careful inspection of them shows that they are unusually clear and accurate in submitting the issues in this case. They submit in accurate language, often approved by this court, the question of mental capacity and undue influence, and no valid objection can be made to them.

However unjust a testamentary paper may appear to be on its face, however unjust a testator may appear by the terms of such an instrument to a part of his family, it is the province of the courts only to submit, on conflicting evidence, the determination of the issues to a jury; and when on such evidence a properly instructed jury finds what the facts are there is no alternative except to enter judgment accordingly.

. The parties have had a fair trial of these issues, and we find in the record no reversible error.

Judgment affirmed.